UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| JACKIE MARQUIS,<br><br>　　　　　Plaintiff,<br>　　v.<br>ABF FREIGHT SYSTEM, INC.,<br><br>　　　　　Defendant. | Case No. 3:23-cv-00315-ART-CLB<br><br>ORDER<br><br>(ECF Nos. 34, 41, 42) |

Plaintiff Marquis alleges that Defendant ABF Freight System fostered a hostile work environment during her several years working at the company. (ECF No. 1.) Defendant moved for summary judgment (ECF No. 34) and objected to specific evidence in Plaintiff's opposition (ECF No. 39). Plaintiff moved for the Court to consider a recently published case (ECF Nos. 41, 42).

The Court denies Defendant's motion for summary judgment, denies without prejudice Defendant's motion to exclude specific evidence in Plaintiff's opposition, and grants Plaintiff's motion for the Court to consider a relevant, recently published case.

**I.　Factual and Procedural Background**

Plaintiff Jackie Marquis began working at ABF Freight in 2016 as a clerk. In 2017, she was promoted to Operations Manager. Marquis's supervisors Tom Kulas and Jason Moraga regarded her as a strong employee. (ECF No. 37-4 at 6; ECF No. 37-6 at 8.) Marquis completed a sexual harassment training by ABF in 2016, a sexual harassment training video in 2018, and another harassment training in 2022. (ECF Nos. 34-11, 34-12, 34-13.)

In 2017, Marquis refused to give driver Josh Crawford his badge to clock-in after he arrived to work an hour-and-a-half late. (ECF No. 37-1 at 32–33, 35.)

1

1  ABF policy prohibited workers who arrived late from clocking in. (*Id.* at 35.)
2  Crawford went to the window where Marquis was sitting, grabbed her arm, yelled
3  at her, and called her "bitch" and "cunt." (*Id.* at 33, 35, 38; ECF No. 34-9.)
4  Marquis felt unsafe and brought another driver, Kyle Kennedy, into the office to
5  protect her. (ECF No. 37-1 at 35–36.) "As soon as Kyle came in, [Crawford]
6  stopped yelling" at her. (*Id.*) Marquis called her supervisor, Tom Kulas, who told
7  Crawford to go home and calm down. (*Id.*) Crawford was fired, then reinstated
8  after pursuing a union grievance. (*Id.* at 37–38.) Marquis believes that Crawford
9  flattened her tires and instigated a hostile confrontation between his niece and
10 Marquis's daughter at their high school. (*Id.* at 33.) Marquis began seeing a
11 psychiatrist because of the Crawford incident, and Crawford stopped working at
12 ABF in 2020. (*Id.* at 37; ECF No. 37-2 at 23–24.)

13  In addition to the incident with Crawford, Marquis's supervisor Kulas
14 frequently made sexually explicit, offensive comments to her between 2017 to
15 2021. Kulas described her as an elephant, referred to her breasts as melons,
16 pontificated about her vagina in front of coworkers, called her and other women
17 employees "hos" and lesbians, told her she should "get raped and have an
18 abortion," and told drivers to call her "Delicious" until she told them not to. (*See*
19 ECF No. 37-1 at 41–42, 45; ECF No. 34-18 at 3; ECF No. 37-9 at 23–25.)
20 Dockworkers whom Kulas supervised followed his lead, asking Marquis if she
21 shows her breasts on request and whether she is trans, and responding to her
22 orders reluctantly. (*See* ECF No. 37-1 at 41–42, 45; ECF No. 34-6 at 126; ECF
23 No. 34-18 at 2–3.)

24  Marquis wanted to contact ABF's Human Resources office, but threats from
25 Kulas kept her from doing so. In August 2020, Marquis drafted but did not send
26 an email to HR about Kulas's and other drivers' conduct. (ECF No. 37-1 at 44.)
27 In the email, Marquis wrote about Kulas having told her "to be quiet and not stir
28 the pot as this could ruin any chance of me being promoted in the future" and

"being told any complaints . . . to HR would look very poorly on me and the company would think twice about any other job in the future." (*Id.* at 46.) The August 2020 email draft described non-supervisory drivers making complaints about her because "they do not like the way I ask them to do a task within the scope of their job." (*Id.* at 45.) Marquis later testified that this meant non-supervisory drivers did not listen to her "because I'm a woman" and had told her "'Ain't no woman gonna tell me what to do.'" (*Id.*) Marquis did not send the email because Tom Kulas had told her that "if I ever report anything to HR, that I might not have a job and nobody likes a cry baby." (*See id.* at 46.) Marquis testified that Kulas made these threats frequently. (*Id.*)

After several more months of enduring this conduct, Marquis emailed ABF's human resources office about Kulas in September 2021. (ECF Nos. 37-1 at 39.) The office responded, undertook an investigation into Kulas's conduct, granted Marquis paid leave during the investigation, and subsequently fired Kulas. (*Id.* at 40–41.)

Several non-supervisory drivers held Marquis responsible for Kulas being fired, which led to them treating her even worse. Marquis testified that "for a little while" after Kulas was fired, drivers were not screaming or yelling at her, and were not calling her names, but soon enough they were harassing her again. (ECF No. 37-2 at 6.) Once, in the months after Kulas's firing, driver Shawn Conrad told Marquis that she "better watch [her] back," which scared her so much that she had to ask a driver to stay with her in the office while she was alone. (ECF No. 37-1 at 48.) Around summer 2022, non-supervisory drivers, in particular Rick Dishaw, spread rumors about Marquis telling drivers that she "was done with these fucking guys" and to "take your fucking route." (ECF No. 37-2 at 2, 3; ECF No. 34-6 at 133, 135.) Around the same time, Marquis had to break up a fight when an ABF driver and a non-ABF driver came to blows near her office. (*See* ECF No. 37-2 at 4–5; ECF No. 34-6 at 139.) Also around August 2022, non-

3

supervisory drivers Shawn Conrad and "Reggie" told Marquis something to the effect of, "fuck you, bitch . . . no woman is telling me what to do." (ECF No. 37-2 at 4–5.)

Marquis submitted a complaint to ABF Human Resources about harassment from non-supervisory drivers in September 2022. (ECF No. 37-8 at 9.) Within the next two weeks, Marquis sent ABF investigators pictures of a flyer posted on the breakroom corkboard modified to suggest that the company would be buying "hookers and blow" for drivers and a note found by a driver about "toxic people" allegedly about Marquis. (ECF No. 34-6 at 153, 155.) Human Resources investigators found Marquis's complaints about non-supervisory drivers and dockworkers' conduct inconclusive and that "communication wasn't good between leadership and with the employees on the dock," so they ordered all employees, including Marquis, to complete an anti-harassment training through ABF in October 2022. (34-19 at 9; ECF No. 34-12 at 2.)

All the while, Marquis's supervisors tolerated sexually explicit and violent music playing at the terminal, even though Marquis and others frequently complained about the music to Kulas and his replacement, Jason Moraga. Marquis produced evidence that songs like "My Dick," (describing artists' penises); "Move Bitch," ("I'm bout to punch your lights out . . . I been thinkin' of bustin' you upside your motherfuckin' forehead"); "WAP," (short for "Wet Ass Pussy"); "Ball for Me," ("we got alcohol, plus bad bitches"); "Baby Got Back," ("that butt you got makes me so horny");  and "Stan," (narrator describes murdering pregnant girlfriend) played loudly on the dock during her time working at ABF. (*See* ECF No. 37-10 (lyrics).) ABF's Senior Manager of Human Resources, Nathan Pearcy, testified that music like the songs that Marquis heard would have violated ABF's sexual harassment policy. (ECF No. 37-8 at 6.)

Several employees recall violent, sexually explicit music playing at ABF before and after Marquis complained of the music. Dockworker Jason Shipp,

dockworker Shawn Conrad, and Marquis's fellow supervisor Fernando Huizar stated in their depositions that offensive music with sexually explicit lyrics played regularly at the dock from 2021 through at least the end of 2023. (ECF No. 37-5 at 19; ECF No. 37-7 at 11; ECF No. 37-9 at 21.) Marquis recalls regularly complaining to Kulas about the music in the years before he was fired. (*See* ECF No. 37-2 at 11, 12 ("[music] was playing all the time").) Marquis recalls other non-supervisory drivers, including Shawn Conrad, Glenn Matthews, Darin Icard, Jason Shipp, Chuck Rather, and Bobby Cox playing violent, sexually explicit music throughout her time at ABF. (ECF No. 37-1 at 30–31.)

Marquis points to other instances of hostile conduct at ABF. Non-supervisory driver Bob Piert screamed at Marquis to "fuck off." (ECF No. 34-6 at 108.) Non-supervisory driver and dockworker Jason Shipp called Marquis "baby" and "sugar." (*Id.* at 107.) Non-supervisory driver Armando Aguirre threatened Marquis with violent gestures. (*Id.* at 83.) At some point after Kulas was fired, Shawn Conrad started rumors that Marquis was trans and that she would display her breasts on request, and non-supervisory driver Bobby Cox asked if she would do so at some point later. (ECF No. 37-2 at 5.) Sometime after Moraga had become supervisor, non-supervisory driver Bryan Holman kicked his desk, slammed a door, and screamed and yelled at Marquis. (ECF No. 37-1 at 47.)

Marquis filed a charge of discrimination with the Nevada Equal Rights Commission (NERC) (co-filed with the EEOC) in November 2022, which described Crawford's assault, Kulas inappropriately describing her body, Kulas physically intimidating her, Kulas saying that she needed to try his "wiener," and Kulas calling her a "ho." (ECF No. 34-18.) The charge also stated that "[d]ue to Mr. [Kulas's] behavior, this allowed other drives [*sic*] to engage in similar conduct towards me." (*Id.*) ABF received the charge in "late spring" 2023. (ECF No. 34-8 at 6.) In the months after ABF learned of Marquis's NERC charge, Moraga, Jason Shipp (the union's shop steward), and other supervisors reduced the playing of

1  sexually explicit and violent music, but testimony of Marquis, Fernando Huizar,
2  Jason Shipp, and Shawn Conrad suggests that violent or sexually explicit songs
3  still played for several months after the charge. (*See* ECF No. 37-2 at 16; ECF No.
4  37-9 at 21; ECF No. 37-5 at 19; ECF No. 37-7 at 11.)

5  Marquis sued in this Court in June 2023. (ECF No. 1.) Defendant fired
6  Marquis around ten months later. A related retaliation action is before the Court.
7  (*See* ECF No. 44.)

8  **II.    Standard of Review**

9  The party moving for summary judgment must show that there is no
10 genuine issue as to any material fact. See Fed. R. Civ. P. 56(a); *Celotex Corp. v.*
11 *Catrett*, 477 U.S. 317, 322-23 (1986). Once the moving party satisfies its burden,
12 the burden shifts to the nonmoving party to "set forth specific facts showing that
13 there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,
14 256 (1986). The Court views the evidence and draws all reasonable inferences in
15 the light most favorable to the non-moving party. *Behrend v. San Francisco Zen*
16 *Ctr., Inc.*, 108 F.4th 765, 768 (9th Cir. 2024).

17 Summary judgment is inappropriate for a hostile work environment claim
18 if a litigant shows enough evidence "that a reasonable juror drawing all inferences
19 in favor of the [party] could return a verdict in the [party's] favor." *Okonowsky v.*
20 *Garland,* 109 F.4th 1166, 1178 (9th Cir. 2024) (citing *Fuller v. Idaho Dep't of*
21 *Corrections*, 865 F.3d 1154, 1161 (9th Cir. 2017) (internal citations removed)).

22 **III.   Analysis**

23 ABF asserts that it is entitled to summary judgment on the following
24 grounds: (1) allegations about Crawford's assault are time-barred; (2) certain
25 allegations about non-supervisory drivers are unexhausted because they were
26 not included in Marquis's NERC charge; (3) Marquis fails to show harassment
27 that was pervasive or severe enough to establish a *prima facie* hostile work
28 environment claim; and (4) there are no facts in dispute about ABF's affirmative

defense based on corrective action. ABF also seeks summary judgment on the availability of punitive damages. The Court addresses each issue in turn.

### 1. Pre-Charge Discriminatory Conduct by Josh Crawford

ABF argues that Marquis may not include Crawford's 2017 conduct in her case because it is time-barred. The statute of limitations for Title VII claims is 300 days from the date of initiating a charge with a state or local anti-discrimination agency. *Draper v. Coeur Rochester, Inc.*, 147 F.3d 1104, 1107 (9th Cir. 1998). Marquis filed her initial intake with the state anti-discrimination agency NERC, which was co-filed with the EEOC, on March 2, 2022, so the 300-day period ordinarily would only include conduct that took place after May 6, 2021. (*See* ECF No. 34-18.) Crawford's alleged assault took place in 2017, and he left the company in 2020. (*See* ECF Nos. 34, 37.) Marquis maintains that her allegations against Crawford fit with the rest of her hostile work environment claim.

Incidents that take place before the 300-day limitations period can be considered with later conduct to form a hostile work environment claim if the pre-limitations conduct involved the same type of employment actions and occurred relatively frequently. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 118 (2002). In *Morgan*, managers "made racial jokes, performed racially derogatory acts, made negative comments regarding the capacity of blacks to be supervisors, and used various racial epithets" both before and after the limitations period, and all of the conduct formed part of the same hostile work environment claim. *Id.* at 121. In *Christian v. Umpqua Bank*, the Ninth Circuit found that two series of incidents in which the defendant permitted a stalker to harass the plaintiff, seven months apart, were enough to show a "pattern of behavior that caused her to feel afraid in her own workplace." 984 F.3d 801, 810 (9th Cir. 2020) (citing *Morgan*, 536 U.S. at 120–21).

Here, ABF employees used sexist epithets, made lewd remarks, and told

Marquis that they would not take orders from a woman both before and after the limitations period. Crawford's acts in 2017 of violently grabbing Marquis's arm, using sexist epithets, and challenging her authority as his supervisor were similar and connected to the conduct of other non-supervisory drivers and her supervisor Kulas. A reasonable juror could find that Crawford's conduct was not a discrete, separable incident, but one step in a "pattern of behavior that caused her to feel afraid in her own workplace." *Christian*, 984 F.3d at 810. Marquis dealt with violence again in 2022, when she had to break up a fight between an ABF driver and a visitor and in 2023 when another driver, Armando Aguirre, made threatening gestures to drivers. (ECF No. 37-2 at 4–5, 10; ECF No. 34-6 at 139.) Additionally, Kulas repeatedly warned Marquis to not report harassment. Rather than protect Marquis and her rights, which was his job, Kulas taunted her. Among other comments, he described her vagina and breasts in front of coworkers and said "you should get raped and have an abortion." (34-18 at 3; 37-9 at 31–32.) Following Kulas's lead, according to Marquis, non-supervisory drivers made lewd comments, asking Marquis if she shows her breasts, calling Marquis "Delicious," and playing music with violent and sexually explicit lyrics long after Marquis and others had complained of it. (ECF No. 37-1 at 41, 42; ECF No. 37-2 at 14, 15.) As in *Morgan*, Marquis points to a continuous pattern of conduct from 2017 to 2023, before and after the limitations period, by Crawford, Kulas, and non-supervisory drivers that was similar in that it consisted of lewd comments, violent acts or references, sexist epithets, questioning or defying her authority, and blasting violent, sexually explicit music, which together created a hostile work environment.

Accordingly, the Court finds that a genuine issue of material fact exists as to whether Crawford's alleged assault sufficiently resembles later hostile conduct to form part of a continuing violation, so it survives summary judgment.

//

**2. Exhaustion**

ABF argues that allegations of harassment by employees besides Crawford and Kulas are unexhausted because they were not included in her NERC charge. Allegations of discrimination not included in a plaintiff's administrative charge may not be considered by a court unless the new claims are like or reasonably related to the allegations in the original charge. *B.K.B. v. Maui Police Dep't*, 276 F.3d 1091, 1100 (9th Cir. 2002) (internal citations removed), *as amended* (Feb. 20, 2002), *overruled on other grounds by Fort Bend Cnty., Texas v. Davis*, 587 U.S. 541 (2019). An allegation in a complaint is "like or reasonably related" to allegations in an administrative charge if the administrative investigation would have grown into examining the additional allegations. *Green v. Los Angeles Cnty. Superintendent of Sch.*, 883 F.2d 1472, 1476 (9th Cir. 1989). Civil claims that "are consistent with the plaintiff's original theory of the case" are like and reasonably related to the complaint. *B.K.B.*, 276 F.3d at 1100 (citing *E.E.O.C. v. Farmer Bros. Co.*, 31 F.3d 891, 899 (9th Cir. 1994)).

Unexhausted allegations are reasonably related to a plaintiff's exhausted allegations of discrimination when conduct alleged in the charge "suggest[s] a pattern" that would encompass the unexhausted allegations, or the unexhausted conduct necessarily underlies the exhausted allegations. *See Chung v. Pomona Valley Cmty. Hosp.*, 667 F.2d 788, 790 (9th Cir. 1982) (reversing the district court finding of non-exhaustion because plaintiff need not "inventory all the discriminatory acts," and unexhausted allegations suggested a pattern of discrimination); *see also Sosa v. Hiraoka*, 920 F.2d 1451, 1457 (9th Cir. 1990) (reversing the district court finding of non-exhaustion because plaintiff's charge describing denial of promotion encompassed a pattern of retaliation that included unexhausted conduct); *Farmer Bros.*, 31 F.3d at 899-900 (evaluation of allegations of post-lay-off discrimination required investigation of the plaintiff's own lay-off). Allegations against coworkers not named in the charge are

1  reasonably related to allegations in the charge if those coworkers "should have
2  anticipated" being named based on the charge's language. *See Chung,* 667 F.2d
3  at 792. By contrast, unexhausted conduct is not reasonably related to exhausted
4  allegations when no facts show it was part of a series, pattern, or practice of
5  discriminatory conduct. *See Freeman v. Oakland Unified School District*, 291 F.3d
6  632, 634 n.4, 638–39 (9th Cir. 2002) (exhausted claim alleging discrimination in
7  teaching faculty election was not related to unexhausted claims about the
8  plaintiff's teaching load).

9      Marquis's unexhausted allegations concerning conduct by non-supervisory
10  drivers and dockworkers relate to a pattern of sexist and lewd conduct that she
11  experienced at ABF and referenced in her NERC charge. The unexhausted
12  allegations include non-supervisory driver Bob Piert screaming at Marquis to
13  "fuck off," non-supervisory driver and dockworker Jason Shipp calling Marquis
14  "baby" and "sugar," non-supervisory driver Armando Aguirre making threatening
15  gestures and calling her derogatory names, and non-supervisory drivers Shawn
16  Conrad, Glenn Matthews, Darin Icard, Chuck Rather, and Bobby Cox playing
17  violent, sexually explicit music. (ECF No. 34-6 at 122; ECF No. 37-1 at 30–31;
18  ECF No. 37-2 at 10, 20.) These allegations also include Marquis having to break
19  up a physical fight between dockworkers, non-supervisory drivers not taking
20  orders from Marquis, workplace graffiti mentioning "hookers" at the office, and a
21  note posted about Marquis in the lunchroom describing "toxic people" allegedly
22  describing her. (ECF No. 34-6 at 153, 155; ECF No. 37-2 at 4–5.)

23      These allegations are related to Marquis's charge, which alleged "a number
24  of discriminatory acts that suggest a pattern." *Chung,* 667 F.2d at 790. Although
25  her charge focused on the offensive conduct by Crawford and Kulas, it provided
26  enough information for ABF to reasonably anticipate that Marquis's lawsuit
27  would include allegations about drivers and dockworkers. *Chung,* 667 F.2d at
28  792. The charge mentioned similar conduct by other ABF employees, stating,

10

"[d]ue to Mr. [Kulas's] behavior, this allowed other drives [sic] to engage in similar conduct towards me," which supports the inference that the NERC or EEOC would have investigated drivers at ABF. *Id.*; *Farmer Brothers,* 31 F.3d at 899. Finally, Marquis's NERC charge also alleged harassment as a continuing practice: "I have been sexually harassed and harassed since 2016." (ECF No. 34-18); *Sosa,* 920 F.2d at 1457; *Chung,* 667 F.2d at 790.

In sum, all of the unexhausted allegations are related to the allegations Marquis exhausted in her NERC charge relating to a continuous pattern of violent, sexist, and lewd conduct at ABF. Accordingly, the Court denies ABF's motion for summary judgment on Marquis's unexhausted allegations.

### 3. Marquis's *Prima Facie* Case

ABF argues that Marquis has failed to show that conduct by drivers was severe, pervasive, or based on sex, and that sexually explicit, violent music playing at the workplace does not rise to the level of a hostile work environment. Marquis responds that all evidence showing existence of a hostile work environment must be considered together when deciding summary judgment.

To avoid summary judgment on a claim for a hostile work environment based on sex, a plaintiff must show genuine issues of fact about "whether a reasonable woman would find the workplace so objectively and subjectively hostile toward women as to create an abusive working environment" and if the employer "failed to take adequate remedial and disciplinary action." *Davis v. Team Elec. Co.,* 520 F.3d 1080, 1095 (9th Cir. 2008). The Court considers "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (citing *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 23 (1993)).

In analyzing a hostile work environment claim, courts consider the totality of circumstances, including "offensive or retaliatory conduct which would not, in

11

isolation, violate Title VII" and "conduct not specifically directed at the plaintiff." *Okonowsky*, 109 F.4th at 1182 (citing *Fuller*, 865 F.3d at 1163 n.9; *Reynaga v. Roseburg Forest Prods.*, 847 F.3d 678, 687 (9th Cir. 2017); *Dominguez-Curry v. Nevada Transp. Dep't*, 424 F.3d 1027, 1036, 1038 (9th Cir. 2005)). This totality analysis takes into account the cumulative effect of discriminatory incidents. *Fried v. Wynn Las Vegas, LLC*, 18 F.4th 643, 648 n.3 (9th Cir. 2021). It includes the "constellation of surrounding circumstances, expectations, and relationships" and considering that "what might be an innocuous occurrence in some circumstances may, in the context of a pattern of discriminatory harassment, take on an altogether different character." *Christian v. Umpqua Bank*, 984 F.3d 801, 809–10 (9th Cir. 2020) (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81–82 (1998); *Draper v. Coeur Rochester, Inc.*, 147 F.3d 1104, 1109 (9th Cir. 1998)). "[A] hostile work environment is ambient and persistent, and . . . it continues to exist between overt manifestations." *Id.* (citing *Draper*, 147 F.3d at 1108 n.1). When considered in its totality and cumulatively, a reasonable juror could find that a subjectively and objectively hostile work environment existed at ABF.

Marquis has shown that she subjectively experienced a hostile work environment by producing evidence of her complaints to Kulas about harassment, her draft email to Huizar about harassment, and her complaints about violent and sexually explicit music. (*See* ECF No. 37-1 at 44–46; ECF No. 37-2 at 11; ECF No. 34-18 at 2–3.)

Marquis has also shown enough facts for a juror to find that ABF's workplace was objectively hostile to women. *Davis*, 520 F.3d at 1095. A year into the job, Marquis had to call in a coworker to physically protect her from Crawford, after he grabbed her arm and yelled sexist epithets at her. (ECF No. 37-1 at 35–36.) Marquis's supervisor Kulas humiliated Marquis by, at various times, calling her and other women employees "hos" and lesbians, talking about her breasts

1    and vagina in front of her and other employees, describing her as an elephant,
2    suggesting that she "go get raped and have an abortion," and tacitly showing
3    other employees that it was acceptable to belittle women. (*See* ECF No. 34-18 at
4    3; ECF No. 37-2 at 5; ECF No. 37-9 at 31–32); *see also Craig v. M & O Agencies,*
5    *Inc.*, 496 F.3d 1047, 1051 (9th Cir. 2007) (discriminatory conduct "all the more
6    egregious [when] perpetrated on the plaintiff by her direct supervisor"). Kulas's
7    abusive behavior toward Marquis was imitated by other drivers whom he also
8    supervised. (ECF No. 34-18 at 3.)

9         ABF also knew about and failed to stop sexually explicit, violent music from
10   playing at its workplace. *See Sharp v. S&S Activewear, L.L.C.*, 69 F.4th 974, 979
11   (9th Cir. 2023) ("sexually graphic" and "violently misogynistic" music may give
12   rise to a Title VII hostile work environment claim). Marquis and her coworkers
13   testified that music like "WAP" [Wet Ass Pussy], "My Dick," "Move Bitch," "Baby
14   Got Back," and "Ball for Me" played loudly and regularly at the dock after Marquis
15   and others complained of it. (*See* ECF Nos. 37-10 at 4–14.) Marquis complained
16   about sexually explicit, violent music playing at the dock to Kulas "all the time"
17   before he was fired in 2021. (*See* ECF No. 37-2 at 11.) In June 2022, Marquis
18   began recording the names of some of the violent, sexually explicit songs playing
19   at ABF. (*Id.* at 12.) In 2022 or 2023, she recalled the song "Baby Got Back," with
20   the lyrics "I like big butts," playing on the dock and drivers yelling at her, "this is
21   your song." (*Id.*) ABF driver Jason Shipp recalled sexually explicit and violent
22   music playing around 2021 and 2022. (ECF No. 37-5 at 12, 19.) Jason Moraga,
23   the manager hired to replace Kulas, held a meeting about stopping violent,
24   sexually explicit music in July 2023 and sent an email instructing supervisors to
25   turn off such music in August 2023. (ECF No. 37-6 at 11.) Marquis's co-worker
26   Fernando Huizar recalled that violent, sexually explicit music had diminished in
27   frequency by November 2023, but he still heard such music in December 2023.
28   (ECF No. 37-9 at 12–13.) These facts prevent summary judgment on ABF's efforts

13

to stop the offensive music.

ABF responds that Marquis, as a supervisor, had an affirmative duty herself to tell dockworkers to turn offensive music off. (*See* ECF No. 34.) Marquis testified that she felt physically intimated by some of the dockworkers who played sexually explicit music and felt reluctant to confront them on her own. (*See* ECF 37-2 at 13, 15–16.) Whether this atmosphere obviated any duty Marquis had to stop the music herself is a question of fact appropriate for the jury.

Taken cumulatively, there is sufficient evidence to establish a triable issue of fact on Marquis's *prima facie* hostile work environment claim.

### 4. Faragher/Ellerth Affirmative Defense

ABF argues that it is entitled to summary judgment on its "*Faragher/Ellerth*" affirmative defense, under which ABF avoids liability if Marquis has unreasonably failed to use ABF's effective internal corrective policies. ABF contends that it swiftly responded to Marquis's complaints of harassment by immediately firing Crawford in 2017 and placing him on different shifts after he was reinstated; firing Kulas in 2021; conducting an internal investigation of Marquis's complaints about non-supervisory drivers in 2022; and stopping violent, sexually explicit music from playing after learning of Marquis's NERC charge in spring 2023. Marquis argues that despite these corrective efforts, a hostile work environment existed because of ABF's failure to stop the playing of violent, sexually explicit music and because Kulas, Marquis's supervisor, discouraged her from using corrective procedures.

An employer may raise the "*Faragher/Ellerth*" affirmative defense to a hostile work environment claim unless a supervisor has taken an adverse employment action against the employee. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); *Craig v. M & O Agencies, Inc.*, 496 F.3d 1047, 1057 (9th Cir. 2007) (applying the defense on summary judgment). To succeed on the defense, the employer must

show (a) that they "exercised reasonable care to prevent and correct promptly any sexually harassing behavior" and "(b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher*, 524 U.S. at 807. The *Faragher/Ellerth* defense applies to the claim as a whole based on the totality of the circumstances, not particular allegations, so the corrective action must effectively resolve the entire hostile work environment claim. *See Okonowsky*, 109 F.4th at 1187; *Nichols v. Azteca Rest. Enterprises, Inc.,* 256 F.3d 864, 876 (9th Cir. 2001) ("where the remedy does not end the current harassment and deter future harassment, liability attaches for both"). Because ABF bears the burden on these elements, the Court may decide this issue by evaluating whether Marquis has put forward any facts contradicting each element of the defense.

### A. ABF's Reasonable Care to Correct Harassment

ABF argues that it exercised reasonable care to prevent and promptly correct any sexually harassing behavior, Marquis points to evidence that ABF knew of and failed to stop the playing of sexually explicit, violent music.

A defendant is only entitled to the *Faragher/Ellerth* defense if the employer takes reasonable care to prevent and promptly correct all types of harassment in the claim, and not if they fail to address specific, alleged instances of harassment. *Faragher*, 524 U.S. at 807; *Okonowsky*, 109 F.4th at 1185 (holding that corrective action must be reasonably effective and immediate). In *Nichols v. Azteca Restaurant Enterprises, Inc.*, a restaurant provided a sexual harassment policy and "mandatory sexual harassment training for all of its employees," which the plaintiff attended. *Nichols*, 256 F.3d at 877. The Ninth Circuit held that the restaurant was not entitled to the affirmative defense, because it did not correct the specific co-worker harassment directed at the plaintiff. *Id.* 876–77. Acting "to prevent sexual harassment generally" is not enough when the specific harassment at issue goes unabated.

15

1    Despite being on notice of that offensive music was being played at ABF in violation of its own policy, ABF failed to stop it. Marquis and others complained about the offensive music for months to Kulas, if not years, before her NERC charge, with no management response. (*See* ECF Nos. 37-1 at 11; ECF No. 37-9 at 21–22); ABF became aware of the problem in late spring 2023, at the latest, when it learned of Marquis's NERC complaint. Though ABF reduced the incidence of sexually explicit, violent music, Marquis's, Shawn Conrad's, and Fernando Huizar's testimonies suggest that sexually explicit, violent music continued to be played in the months after Marquis's charge. (ECF No. 37-9 at 21; ECF No. 37-5 at 19; ECF No. 37-7 at 11.) These facts, viewed in the light most favorable to Marquis, are enough to preclude summary judgment for the first element of the defense because there is a genuine factual issue as to whether ABF exercised reasonable care in correcting sexually harassing behavior, including the playing of sexually explicit, violent music, that contributed to a hostile work environment.

**B. Marquis's Failure to Use Corrective Procedures or Avoid Harm**

ABF argues that no evidence shows or suggests that Marquis took advantage of ABF's corrective opportunities or otherwise avoided harm. *Faragher*, 524 U.S. at 807. Marquis responds that she did in fact use corrective procedures, that any failure to act was based on her reasonable fear, and that there are disputed facts about the efficacy of ABF's corrective measures.

Marquis points to evidence that she used corrective procedures to stop harassment. ABF's Human Resources policies list contacting a supervisor as one way to report harassment, and Marquis told Kulas that she found the music offensive and that she found his conduct offensive. (*See* ECF No. 34-10 at 3; ECF No. 34-16 at 8; ECF No. 37-1 at 11, 44–46.) Marquis used ABF's corrective procedures to report Crawford and Kulas, though it led to additional harassment from non-supervisory drivers upset with her actions. (*See* ECF No. 37-1 at 48, 49.) Marquis complained about non-supervisory drivers' conduct in 2022, and

1  HR ultimately made no disciplinary decisions based on her complaint. (ECF No.
2  37-8 at 9.) And Marquis and others repeatedly complained about the offensive
3  music to Kulas individually and to Moraga individually and at meetings. (*See* ECF
4  No. 37-1 at 11; ECF No. 37-2 at 15; ECF No. 37-9 at 16, 21–22.) Based on these
5  facts, a reasonable juror could find that Marquis used ABF's corrective
6  procedures.

7  Facts suggest that when Marquis avoided or delayed using corrective
8  procedures, it was because of justifiable fear. *See Craig*, 496 F.3d at 1058
9  (discrimination victim "justifiably may have delayed reporting in hopes of avoiding
10 . . . adverse—or at least unpleasant—employment consequences"). Marquis
11 testified that although she drafted an email to HR in August 2020 about Kulas's
12 conduct, she decided not to send it because "I was scared that I would be
13 fired . . . retaliated against or called more names if someone found out . . . Tom
14 Kulas had threatened me that if I ever report anything to HR, that I might not
15 have a job and nobody likes a crybaby." (ECF No. 37-1 at 44.) As Marquis's direct
16 supervisor, Kulas discouraged her from reporting with these sorts of threats,
17 telling her "not to stir the pot" and that any complaints to HR would "hurt any
18 chances of promotion." (*See id.* at 46). Given these threats from a direct superior,
19 a reasonable juror could find that Marquis's delay or avoidance in using
20 corrective procedures was justified.

21 Marquis's history of trauma and anxiety, combined with her justified fear
22 of losing her job, also supports finding that Marquis's delay was reasonable. (*See*
23 ECF Nos. 37-1, 37-7 (describing Marquis's history of childhood trauma)); *see*
24 *Holly D.*, 339 F.3d 1158, 1179 n.24 (9th Cir. 2003) (trauma and mental health
25 problems "may render the failure to seek relief through the employer's available
26 procedures objectively reasonable").

27 Finally, fact issues exist regarding whether ABF effectively resolved
28 complaints about sexually explicit, violent music. ABF employees testified to

hearing such music even after the company implemented its response to stop the music. (*See supra* III.3; ECF No. 37-5 at 12, 19; ECF No. 37-9 at 12–13.)

Accordingly, disputed issues of fact preclude summary judgment regarding Marquis's use of ABF's corrective procedures.

**5. Punitive Damages**

ABF argues that Marquis may not seek punitive damages because no facts show that ABF discriminated against Marquis with malice or reckless indifference to her Title VII rights.

Punitive damages may be awarded under Title VII if the plaintiff satisfies a three-step, burden-shifting test. *Hemmings v. Tidyman's Inc.,* 285 F.3d 1174, 1197–98 (9th Cir. 2002) (citing *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 534–35 (1999)). The plaintiff must show that the employer discriminated with malice or reckless indifference to the plaintiff's Title VII rights. Then, the plaintiff must show that the discrimination, if by an employee, is attributable to the employer. *Id.* Finally, the employer may then raise an affirmative defense, similar to the *Faragher/Ellerth* defense, that it made good faith efforts to comply with Title VII, if "such efforts were contrary to the actions of its managerial agents." *Hemmings*, 285 F.3d at 1197–98; *Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 516 (9th Cir. 2000).

Marquis's evidence shows that ABF tolerated and failed to stop the playing of violent, sexually explicit music or may have failed to timely address Kulas's conduct. The evidence shows that this conduct was arguably (1) reckless, (2) attributable to ABF, and (3) not excused by the affirmative defense. Recklessness in this context means that the employer discriminated "in the face of a perceived risk that its actions will violate federal law." *Kolstadt*, 527 U.S. at 536.

The playing of obscene music was arguably reckless and attributable to ABF. As to recklessness, the fact that ABF conducted sexual harassment training for Marquis and other employees in 2016, 2018, and 2022 shows that ABF and

18

its employees were aware of Marquis's protected rights. (ECF No. 34-9.) ABF's HR agent acknowledged that the violent, sexually explicit music that played at ABF would have violated the company's anti-discrimination policy, which was in effect from the time Marquis started working there. (ECF No. 37-8 at 9.) The conduct was arguably attributable to ABF, which learned of the music, at the latest, when it received Marquis's NERC charge in May 2023. It arguably knew much earlier because Marquis and others complained about the music for several months, if not years, to the terminal manager, Kulas, who did nothing about it. (*See supra* III.3.) This evidence creates a dispute of fact about whether allowing the music was attributable to ABF. Finally, there is evidence that the offensive music continued to be played into November 2023, thus creating a factual issue as to ABF's good faith efforts to stop it. (*Id.*) Viewed in the light most favorable to Marquis, there is sufficient evidence to create a genuine issue of material fact as to punitive damages based on ABF's having tolerated and failed to effectively remedy the music.

Alternatively, Marquis has provided sufficient evidence to create a factual issue that Kulas acted recklessly, that his bad acts could be attributed to ABF, and that ABF is not entitled to an affirmative defense on punitive damages. *See Passantino*, 212 F.3d at 517 (holding that the affirmative defense to punitive damages is unavailable when employees "who engage in illegal conduct are sufficiently senior to be considered proxies for the company"). Kulas, as a service center manager, received sexual harassment training, and thus knowingly violated Marquis's rights. His actions are arguably attributable to ABF on two grounds. First, as a supervisor, Kulas was responsible for receiving and acting on complaints of harassment. (*See* ECF Nos. 34-9, 37-8); *Swinton v. Potomac Corp.*, 270 F.3d 794, 800–01, 810 (9th Cir. 2001) ("[T]he inaction of even relatively low-level supervisors may be imputed to the employer if the supervisors are made responsible, pursuant to company policy, for receiving and acting on complaints

19

of harassment."). Second, there is a factual issue about whether he was senior enough to render the affirmative defense to punitive damages unavailable. *See Hemmings*, 285 F.3d at 1197–98; *Passantino*, 212 F.3d at 516–17 (discussing whether harassing employee sufficiently senior to preclude affirmative defense as fact issue).

Accordingly, the Court finds that summary judgment is not appropriate on punitive damages.

**IV. Conclusion**

The Court ORDERS that ABF's motion for summary judgment (ECF No. 34) be denied.

The Court also dismisses Defendant's objections to exclude Marquis's evidence (ECF No. 39) without prejudice, noting that this evidence was not necessary to decide this motion and permitting Defendant to refile these objections closer to trial.

Further, the Court grants Marquis's motion to request consideration of *Okonowsky v. Garland*, 109 F.4th 1166 (9th Cir. 2024) (ECF Nos. 41, 42).

Dated this 21st day of February 2025.

_____
ANNE R. TRAUM
UNITED STATES DISTRICT JUDGE